August 17, 1993 UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 91-1896

UNITED STATES,
Appellee,

v.

KENNETH INNAMORATI,
Defendant, Appellant.

No. 91-1897

UNITED STATES,
Appellee,

v.

WILLIAM THOMPSON,
Defendant, Appellant.

No. 91-1898

UNITED STATES,
Appellee,

v.

JAMES GRADY, a/k/a THE REBEL,
Defendant, Appellant.

No. 91-1899

UNITED STATES,
Appellee,

v.

ROBERT DEMARCO, SR.,
Defendant, Appellant.

No. 91-1900

UNITED STATES,
Appellee,

v.

WILLIAM LETTERS,
Defendant, Appellant.

No. 91-1901

UNITED STATES,
Appellee,

v.

ROBERT DEMARCO, JR.,
Defendant, Appellant.

No. 91-1902

UNITED STATES,
Appellee,

v.

PHILLIP BARGALLA, a/k/a FLIP,
Defendant, Appellant.

No. 91-1903

UNITED STATES,
Appellee,

v.

JAMES LITTERIO, a/k/a MICKEY,
Defendant, Appellant.

No. 91-1924

UNITED STATES,
Appellee,

v.

JOHN BOISONEAU,
Defendant, Appellant.

No. 92-1253

UNITED STATES,
Appellee,

v.

JOSEPH GILBERTI,
Defendant, Appellant.

ERRATA SHEET

The opinion of the Court issued on June 17, 1993, is amended
as follows:

On page 30, lines 1-2 of the fourth paragraph of the block
quote, replace "Paula Bufton" with "Paula [sic] Bufton".

July 8, 1993
UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 91-1896
UNITED STATES,
Appellee,

v.

KENNETH INNAMORATI,
Defendant, Appellant.

No. 91-1897
UNITED STATES,
Appellee,

v.

WILLIAM THOMPSON,
Defendant, Appellant.

No. 91-1898
UNITED STATES,
Appellee,

v.

JAMES GRADY, a/k/a THE REBEL,
Defendant, Appellant.

No. 91-1899
UNITED STATES,
Appellee,

v.

ROBERT DEMARCO, SR.,
Defendant, Appellant.

No. 91-1900
UNITED STATES,
Appellee,

v.

WILLIAM LETTERS,
Defendant, Appellant.

No. 91-1901
UNITED STATES,
Appellee,

v.

ROBERT DEMARCO, JR.,
Defendant, Appellant.

No. 91-1902
UNITED STATES,
Appellee,

v.

PHILLIP BARGALLA, a/k/a FLIP,
Defendant, Appellant.

No. 91-1903
UNITED STATES,
Appellee,

v.

JAMES LITTERIO, a/k/a MICKEY,
Defendant, Appellant.

No. 91-1924
UNITED STATES,
Appellee,

v.

JOHN BOISONEAU,
Defendant, Appellant.

No. 92-1253
UNITED STATES,
Appellee,

v.

JOSEPH GILBERTI,
Defendant, Appellant.

ERRATA SHEET

The opinion of the Court issued on June 17, 1993, is amended as
follows:

On page 44, lines 14-16: replace the sentence "Although the
notation was produced prior to the cross-examination of Scott, counsel
for Grady declined to ask Scott any questions." with the sentence
"Grady sought to call O'Brien to the stand to question him about the

notation, but he never sought to recall Scott for further cross-
examination once the notes were produced."

June 23, 1993
UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 91-1896
UNITED STATES,
Appellee,

v.

KENNETH INNAMORATI,
Defendant, Appellant.

No. 91-1897
UNITED STATES,
Appellee,

v.

WILLIAM THOMPSON,
Defendant, Appellant.

No. 91-1898
UNITED STATES,
Appellee,

v.

JAMES GRADY, a/k/a THE REBEL,
Defendant, Appellant.

No. 91-1899
UNITED STATES,
Appellee,

v.

ROBERT DEMARCO, SR.,
Defendant, Appellant.

No. 91-1900
UNITED STATES,
Appellee,

v.

WILLIAM LETTERS,
Defendant, Appellant.

No. 91-1901
UNITED STATES,
Appellee,

v.

ROBERT DEMARCO, JR.,
Defendant, Appellant.

No. 91-1902
UNITED STATES,
Appellee,

v.

PHILLIP BARGALLA, a/k/a FLIP,
Defendant, Appellant.

No. 91-1903
UNITED STATES,
Appellee,

v.

JAMES LITTERIO, a/k/a MICKEY,
Defendant, Appellant.

No. 91-1924
UNITED STATES,
Appellee,

v.

JOHN BOISONEAU,
Defendant, Appellant.

No. 92-1253
UNITED STATES,
Appellee,

v.

JOSEPH GILBERTI,
Defendant, Appellant.

ERRATA SHEET

The opinion of this Court issued on June 17, 1993, is amended as
follows:

On third page under list of attorneys "Levchuck should read

Levchuk."

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 91-1896
UNITED STATES,
Appellee,

v.

KENNETH INNAMORATI,
Defendant, Appellant.

No. 91-1897
UNITED STATES,
Appellee,

v.

WILLIAM THOMPSON,
Defendant, Appellant.

No. 91-1898
UNITED STATES,
Appellee,

v.

JAMES GRADY, a/k/a THE REBEL,
Defendant, Appellant.

No. 91-1899
UNITED STATES,
Appellee,

v.

ROBERT DEMARCO, SR.,
Defendant, Appellant.

No. 91-1900
UNITED STATES,
Appellee,

v.

WILLIAM LETTERS,
Defendant, Appellant.

No. 91-1901
UNITED STATES,
Appellee,

v.

ROBERT DEMARCO, JR.,
Defendant, Appellant.

No. 91-1902
UNITED STATES,
Appellee,

v.

PHILLIP BARGALLA, a/k/a FLIP,
Defendant, Appellant.

No. 91-1903
UNITED STATES,
Appellee,

v.

JAMES LITTERIO, a/k/a MICKEY,
Defendant, Appellant.

No. 91-1924
UNITED STATES,
Appellee,

v.

JOHN BOISONEAU,
Defendant, Appellant.

No. 92-1253
UNITED STATES,
Appellee,

v.

JOSEPH GILBERTI,
Defendant, Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Frank H. Freedman, Senior District Judge]

Before

Torruella, Circuit Judge,

Aldrich, Senior Circuit Judge,

and Boudin, Circuit Judge.

J. Michael McGuinness, by Appointment of the Court, with whom

McGuinness & Parlagreco was on brief for appellant Kenneth Innamorati.

Diane Powers, by Appointment of the Court, for appellant William

Thompson.
Robert L. Rossi, by Appointment of the Court, for appellant James

Grady.
Robert J. Danie, by Appointment of the Court, with whom Bonavita,

Gordon, and Danie, P.C. was on brief for appellant Robert DeMarco, Sr.

Michael C. Bourbeau, by Appointment of the Court, with whom

Bourbeau and Bourbeau was on brief for appellant William Letters.

Warren R. Thompson, by Appointment of the Court, for appellant

Robert DeMarco, Jr.
Henry C. Porter, by Appointment of the Court, for appellant

Phillip Bargalla.
Arthur R. Silen, by Appointment of the Court, for appellant James

Litterio.
Frances L. Robinson, by Appointment of the Court, with whom

Davis, Robinson & White was on brief for appellant John Boisoneau.

Dwight M. Hutchison, by Appointment of the Court, for appellant

Joseph Gilberti.
Andrew Levchuk, Assistant United States Attorney, with whom A.

John Pappalardo, United States Attorney, and Kevin O'Regan, Assistant

United States Attorney, were on brief for appellee.

June 17, 1993

BOUDIN, Circuit Judge. In this case ten individuals

challenge, on a wide variety of grounds, their convictions

and sentences following a jury trial in the district court.1

All ten defendants were found guilty of conspiring to

distribute and to possess with intent to distribute cocaine

and marijuana, in violation of 21 U.S.C. 846 and

841(a)(1). All defendants except Thompson were convicted of

one or more additional counts relating to the ring's

activities. For the reasons that follow, we reverse

defendant Grady's conviction on one count for insufficient

evidence and remand for resentencing, and we sustain each of

the remaining convictions and sentences.

I. BACKGROUND

The voluminous testimony and other evidence properly

introduced at trial, viewed in the light most favorable to

the verdicts, see United States v. Rivera-Santiago, 872 F.2d

1073, 1078-79 (1st Cir.), cert. denied, 492 U.S. 910 (1989),

established the following facts. In 1984, Brian Fitzgerald

and Paul Callahan--two co-conspirators who testified for the

government at trial--met in Walpole penitentiary while

serving terms of imprisonment there. The two men formed an

1The ten are Kenneth Innamorati, William Thompson, James
Grady, Robert DeMarco Sr., William Letters, Robert Demarco
Jr., Phillip Bargalla, James Litterio, John Boisoneau, and
Joseph Gilberti.

-14-

alliance, agreeing that upon their release from prison they

would begin a drug distribution network.

After their release, Callahan and Fitzgerald began drug

dealing. In 1985, they were approached by an intermediary

and asked if they could supply a kilogram of cocaine to

Kenneth Innamorati and his then-partner, Noel Bouvier.

Fitzgerald and Callahan agreed to supply the cocaine, which

they acquired from a source in Everett, Massachusetts, and

then delivered to Innamorati in Framingham in exchange for

$55,000. About three months later, Fitzgerald and Callahan

agreed to join forces with Innamorati and Bouvier. At that

time, Innamorati's principal source for cocaine was an

individual in Boston. Callahan and Fitzgerald each picked up

kilograms of cocaine from the supplier and delivered it to

Innamorati, who weighed it, mixed it with other substances to

increase its volume, and separated it into smaller

quantities. Callahan and Fitzgerald then delivered the drugs

to Innamorati's customers.

After a time, Innamorati lost the services of his Boston

supplier, and Callahan began supplying Innamorati with

cocaine from Callahan's own sources. Callahan made contact

with an individual named Tom Reilly in Florida. Reilly

ultimately supplied Callahan and Innamorati with large

quantities of cocaine and marijuana on a regular basis from

the summer of 1985 onward. In June 1985, Fitzgerald hired

-15-

defendant Grady, who drove a tractor-trailer, to pick up the

cocaine and marijuana from Reilly in Florida and haul it to

Massachusetts. Grady made this trip about once a month

between June 1985 and February 1988, occasionally bringing

cash down to Florida to pay for prior shipments.

Callahan and Innamorati developed an elaborate system

for storage and distribution of the narcotics once they

reached Massachusetts. The drugs were stored in several

different locations. For example, some of the drugs were

stashed in the trunk of a car parked in a storage unit at a

self-storage facility called Hyperspace in Holliston,

Massachusetts. Drugs were also stored in a rented apartment

in a development called Edgewater Hills in Framingham,

Massachusetts. In May 1987, a new apartment in Edgewater

Hills was selected. Edward Tulowiecki, an acquaintance of

Innamorati who was a star witness at trial, agreed to live in

the apartment and assist Innamorati; Innamorati paid a

portion of the rent for the apartment.

This Edgewater Hills apartment became the base of

operations for much of the conspirators' activities.

Innamorati and Callahan moved a considerable array of drug

distribution paraphernalia into the apartment, including

scales, a safe and a freezer. Callahan and Innamorati

frequently came to the apartment to deliver or pick up

packages of cocaine and marijuana, or to prepare and package

-16-

them for distribution. Tulowiecki was not permitted to have

other guests in the apartment.

Innamorati used beepers and cellular telephones to

facilitate his distribution activities. Each of the persons

to whom he regularly distributed the narcotics was assigned a

code number. To place an order, he or she would place a call

to Innamorati's beeper, and then enter the code number and

the quantity sought; the order would then be transmitted to

the digital display on Innamorati's beeper. Innamorati

preferred cellular rather than ordinary telephones for

communications relating to drug distribution, because he

believed that cellular telephones were more difficult to tap.

William Thompson, a former Clinton police officer and a

friend of Innamorati, acquired and installed several cellular

phones for Innamorati and registered the phones in Thompson's

own company name.

Innamorati distributed cocaine and marijuana to numerous

individuals between summer 1985 and February 1988, including

Thompson, William Letters, James Litterio, and John

Boisoneau; each of these purchasers was assigned a beeper

number in Innamorati's system. Callahan had a number of

customers of his own during this period, including defendants

Robert DeMarco Sr., Robert DeMarco Jr., Phillip Bargalla and

Joseph Gilberti. Generally there was evidence that these

-17-

persons resold portions of the cocaine they purchased from

Callahan or Innamorati to others.

In November 1987 Jeffrey Scott, a nephew and cocaine

customer of Callahan who was also in debt to Callahan,

contacted the Drug Enforcement Agency ("DEA") and provided

information about Callahan's activities. This began an

extensive covert investigation into the Callahan/Innamorati

operation. By late February 1988 the DEA had obtained enough

information to execute a series of search warrants at the

Hyperspace facility, Fitzgerald's and Callahan's residences,

and the Edgewater Hills apartment. At the latter site the

agents found two kilograms of cocaine and 75 pounds of

marijuana, as well as drug distribution paraphernalia,

records of drugs transactions and a small cache of weapons

and ammunition.

After a 32-day jury trial conducted from September to

November 1990, all ten defendants in this appeal were

convicted. In addition to the common conspiracy count, all

defendants except Thompson and Bargalla were convicted of one

or more counts of possession of cocaine or marijuana with

intent to distribute in violation of 21 U.S.C. 841(a)(1);

Bargalla was convicted of the lesser included offense of

simple possession. In addition, Innamorati was convicted of

using a firearm in relation to a drug trafficking offense in

violation of 18 U.S.C. 924(c)(1), and of conducting a

-18-

continuing criminal enterprise in violation of 21 U.S.C.

848.

The ten defendants in this appeal raise numerous

separate issues relating either to conviction or sentence.

In certain instances, claims of error are made but only

cursorily discussed. Where appropriate we have invoked "the

settled appellate rule that issues adverted to in a

perfunctory manner, unaccompanied by some effort at developed

argumentation, are deemed waived." United States v. Zannino,

895 F.2d 1, 17 (1st Cir.), cert. denied, 494 U.S. 1082

(1990). Because a number of the claims overlap, we discuss

them by subject.

II. SEVERANCE

Innamorati, Thompson, Grady, DeMarco Sr., DeMarco Jr.,

Bargalla, and Gilberti challenge the district court's denial

of their motions to sever each of their trials from those of

their co-defendants. Defendants argue that severance was

necessary to protect them from prejudice and the possibility

that the jury would fail to consider the evidence separately

as to each defendant.

Prejudice from joinder can come in various forms,

including jury confusion, the impact of evidence that is

admissible against only some defendants, and "spillover"

effects where the crimes of some defendants are more horrific

or better documented than the crimes of others. But joinder

-19-

is normally economical--especially where defendants are

charged with the same core crime--and clear instructions can

often confine the risk of prejudice. Accordingly, it is

settled that defendants are not entitled to severance merely

because it would improve their chances of acquittal; rather,

substantial prejudice "amounting to a miscarriage of justice"

must be proved before a severance is mandatory. United

States v. Sabatino, 943 F.2d 94, 96-97 (1st Cir. 1991). We

review the refusal of a trial court to grant a severance for

abuse of discretion, United States v. Johnson, 952 F.2d 565,

581 (1st Cir. 1991), cert. denied, 113 S. Ct. 58 (1992), and

we find no such abuse in this case.

Despite the number of defendants, there is no indication

of jury confusion in this case. The government in summing up

separated the evidence as to each defendant. The trial judge

gave the customary instruction, emphasizing that each

defendant must be judged separately based on the evidence

admissible against that defendant. The jury apparently found

itself capable of distinguishing: it acquitted one

defendant--Thomas Agnitti, who is not a party to this appeal-

-on the conspiracy count and on other counts convicted two

defendants (Agnitti and Bargalla) only on lesser included

offenses.

Innamorati aside, none of the defendants points to any

specific evidence that significantly inculpated that

-20-

defendant but was admissible only against another defendant.

Indeed, the core of the case was the alleged common

conspiracy; thus, after the necessary foundation, most of the

evidence of wrongdoing by one conspirator was admissible

against other conspirators as well. Nor is this a case in

which separable acts of an individual defendant are so

disproportionately heinous that there is an arguable taint

merely from the association among defendants. In sum, for

everyone apart from Innamorati, this is a garden-variety

joinder almost routine in drug conspiracy cases. Innamorati

does point to evidence that he argues was harmful to him but

properly admissible only as to another defendant, namely, the

grand jury testimony of Thompson. In our view, this grand

jury testimony was not admissible against Innamorati; but,

for reasons discussed in part IV, we also conclude also that

Innamorati is not entitled to a reversal on account of this

testimony.

III. SUFFICIENCY OF THE EVIDENCE

Thompson, Grady, Letters, DeMarco Jr., Bargalla,

Litterio and Gilberti argue that the evidence introduced at

trial was insufficient to support their convictions.2

2Innamorati also raises this issue in his brief, but
only by asserting in conclusory terms that the evidence was
insufficient to establish his guilt. Ordinarily, this claim
would be waived but in this instance we necessarily consider
the weight of the evidence against him in part IV as part of
our harmless error analysis.

-21-

Defendants bear the heavy burden of demonstrating that no

reasonable jury could have found them guilty beyond a

reasonable doubt. See Rivera-Santiago, 872 F.2d at 1078-79.

An appellate court must view the evidence in the light most

favorable to the prosecution, "drawing all plausible

inferences in its favor and resolving all credibility

determinations in line with the jury's verdict." United

States v. David, 940 F.2d 722, 730 (1st Cir.), cert. denied,

112 S. Ct. 605 (1991). We conclude that, with one exception,

the prosecution offered evidence adequate to support the

convictions.

A. William Thompson

Thompson was convicted of conspiracy to distribute and

to possess with intent to distribute cocaine and marijuana,

in violation of 21 U.S.C. 846 and 841(a)(1). Conviction

for conspiracy requires proof that the defendant entered into

an agreement with another to commit a crime, here, an

agreement with Innamorati to distribute cocaine and

marijuana. United States v. Concemi, 957 F.2d 942, 950 (1st

Cir. 1992). This agreement need not be expressed; it "may be

implicit in a working relationship between the parties that

has never been articulated but nevertheless amounts to a

joint criminal enterprise." United States v. Moran, 984 F.2d

1299, 1300 (1st Cir. 1993).

-22-

There was evidence--in fact, Thompson admitted in his

testimony before the grand jury--that Thompson provided

"registry checks" of license plates at Innamorati's request.

When Innamorati became suspicious of vehicles that he thought

were following him or that were being used by prospective

drug purchasers, he asked Thompson, a former police officer,

to run the plates through the state's computer registry. If

the registry check came back "not on file" or "no response,"

Innamorati had reason to believe that the vehicle belonged to

a law enforcement agency and was being driven by an

undercover agent. Thompson also admitted that he acquired

two cellular telephones for Innamorati's use which Thompson

leased in his own company's name.

Relying primarily on Direct Sales Co. v. United States,

319 U.S. 703, 709 (1943), Thompson argues that there was

insufficient evidence that Thompson knew of the use to which

Innamorati put these goods and services, or that Thompson

intended that they be used in that manner. But Thompson

admitted in testimony before the grand jury that he regularly

purchased cocaine from Innamorati when he was employed as a

police officer from 1970 to 1978. Tulowiecki testified that

he regularly distributed cocaine to Thompson from Innamorati

in 1987. Thompson was assigned a beeper number in

Innamorati's communications network. Thompson also admitted

-23-

that he knew that the cellular telephones he provided were to

be used to "elude law enforcement."

Thompson argues vehemently that he could not have been a

full-fledged conspirator because he was excluded from certain

locations at which Innamorati stored his drugs, and because

Callahan and Fitzgerald could not identify him at trial.

These facts do not defeat Thompson's membership in the

conspiracy. It is black-letter law that one need not be

familiar with every other person with whom he is found to

have conspired, nor must he participate in the conspiracy to

the same extent as all others. See United States v. Rios,

842 F.2d 868, 873 (6th Cir. 1988), cert. denied, 488 U.S.

1031 (1989); United States v. Giry, 818 F.2d 120, 127 (1st

Cir.), cert. denied, 484 U.S. 855 (1987). Taken as a whole,

the evidence allowed the jury to find that Thompson was a

knowing member of the drug conspiracy.
B. James Grady

The evidence showed that Grady brought numerous

shipments of cocaine and marijuana from Florida to Callahan

and Innamorati in Massachusetts. Several witnesses,

including Callahan, Fitzgerald and Reilly, described in

consistent detail Grady's practice of transporting the

cocaine and the cash in a tool box in the cab of his tractor-

trailer. There was also ample evidence that Grady knew that

the shipments contained narcotics. Fitzgerald testified that

he told Grady that the tool box contained cocaine. Reilly

-24-

recounted one occasion on which Grady watched while bales of

marijuana were loaded onto his truck. Evidence showed that

Grady occasionally brought large amounts of cash from

Massachusetts to Florida to pay Reilly.

In the face of this testimony, Grady contends that the

evidence was insufficient to convict him of conspiracy to

distribute. He argues that Callahan and Innamorati had

suppliers other than Reilly and that even as to Reilly there

were other couriers in addition to Grady. He also points out

that although the conspiracy allegedly continued from 1984

until November 1988, the evidence of his participation was

limited to the period between June 1985 and February 1988.

But Grady need not have been the exclusive courier in order

to be a conspirator, nor must he have been involved in the

conspiracy during the entire life of the operation. See,

e.g., United States v. Baines, 812 F.2d 41, 42 (1st Cir.

1987). We have no trouble finding the evidence adequate to

support Grady's conspiracy conviction.

In addition to conspiracy Grady was also convicted under

counts three and four of the indictment of possession of

cocaine on February 25 and 27, 1988, with intent to

distribute. These were the dates on which DEA agents

executed the search warrants on the Hyperspace facility and

the Edgewater Hills apartment, respectively. The

government's theory at trial was that Grady was guilty of

-25-

possessing the cocaine found at these locations because he

had carried that cocaine from Florida in his tractor-trailer.

Although Grady was linked to the cocaine found in the

Hyperspace facility, we agree with Grady that there was

insufficient evidence that he ever possessed the cocaine

found in the Edgewater Hills apartment.

Callahan testified that he gave Grady a toolbox

containing three kilograms of cocaine in Florida on February

20, 1988, and that on February 24 he retrieved the toolbox

from Grady in Massachusetts and drove to the Hyperspace

storage facility. The next day, the government executed the

search warrant at the facility and seized exactly three

kilograms of cocaine. It is difficult to see, therefore, how

the cocaine seized a few days later from the Edgewater

apartment could also have come from Grady's February 20

shipment. The government argues that Callahan also testified

that he brought the toolbox with him to the Edgewater

apartment after leaving Hyperspace. Thus, the government

says, "[w]hile the evidence on [this] score may be open to

dispute," that dispute was for the jury to resolve.

It is true that Callahan's testimony is unclear--one

cannot tell whether he stored the three kilograms at

Hyperspace, or took them with him when he left there and went

to the Edgewater apartment. But the testimony of Scott, who

accompanied Callahan, is clear on this point. Scott

-26-

testified that Callahan took the cocaine out of the toolbox,

placed it in the trunk of the car in the Hyperspace storage

compartment, and then left the facility with the toolbox, now

emptied of its drugs. The testimony is also clear that only

three kilograms were transported by Grady on this trip, and

that exactly three kilograms were seized by federal agents a

few days later from the Hyperspace facility.

It is of course quite possible, indeed likely, that at

least some of the cocaine found in the Edgewater apartment

was a remnant of a prior shipment by Grady. But this is

conjecture. The government does not advance the theory here,

nor did it do so before the jury, and there was evidence of

other suppliers and couriers. Accordingly, finding no

evidence to support Grady's conviction for possessing the

cocaine seized on February 27, we reverse his conviction on

count four. This may have no effect on Grady's actual

sentence, since the counts were grouped and the sentence was

based on the volume of drugs foreseen; but out of an

abundance of caution we remand his case to the district court

for resentencing.

C. William Letters

Letters was convicted of conspiracy and one count of

possession with intent to distribute. He argues that there

was insufficient evidence to prove he that entered into an

agreement to distribute narcotics. He concedes that the

-27-

evidence showed a number of deliveries of cocaine to him from

Innamorati (via Tulowiecki), in amounts ranging from nine

grams to, on one occasion, as much as an ounce (28 grams).

But Letters says that the evidence also showed that he was a

very heavy personal user of cocaine. He argues that there is

no basis for an inference that he was involved in further

distribution of the drugs he acquired. Thus, according to

Letters, "[t]he government's proof only demonstrated that

Letters was a regular customer of Innamorati for personal

use." We need not decide when and whether "a regular

customer" buying for personal use could be treated as a

conspirator in a drug distribution ring, see Moran, 984 F.2d

at 1302-04, because the evidence permitted the jury to find

that Letters also distributed portions of the large amount of

cocaine he purchased from Innamorati. During direct

examination of Tulowiecki, the following exchange took place:

Q. And how did you package the cocaine for
Letters?

A. Well, with Bill Letters, we would take nine
grams of cocaine and put in five grams of cut.[3]
And I grind that all together, and it would come
out to fourteen. And I would put these all into
individual packages. And one, another specific
package for Bill Letters himself that was pure
cocaine.

. . . .

3 Various witnesses explained during trial that "cut"
refers to additives that were mixed into the cocaine to
increase its volume and, potentially, its resale value.

-28-

Q. Why did [Innamorati] want you to package the
cocaine this way [for Letters]?

A. Because Billy Letters didn't have a scale. .
. .

From Tulowiecki's reference to individual packaging and

to a separate package of cocaine "for Bill Letters himself,"

there is certainly a permissible inference that the other

individual packages were destined to be resold to others.

This inference is reinforced by the use of "cut" and by the

large volume of cocaine that Letters acquired, shown by

Tulowiecki's records to be a total of 336.5 grams of cocaine

between June 1987 and February 1988. Accordingly, Letters'

convictions for conspiring to distribute cocaine and for

possessing cocaine with intent to distribute were supported

by adequate evidence.

D. Robert DeMarco Jr.

DeMarco Jr. was convicted of conspiracy and possession

of cocaine with intent to distribute. His challenge goes

less to the quantity of the evidence in support of these

convictions as to its quality. He argues that the evidence

was deficient because the government did not catch him in the

act, such as by recording his telephone conversations or

conducting a controlled buy from him, but instead relies

entirely on "weak circumstantial evidence." The evidence may

not be overwhelming but it is sufficient.

-29-

Both Callahan and Scott described repeated deliveries of

cocaine to DeMarco Jr. In addition, Callahan testified that

DeMarco Sr. told him that between May 1987 and February 1988,

DeMarco Jr. was selling ounces, half-ounces and quarter-

ounces of cocaine to his (DeMarco Jr.'s) various customers,

and complained that DeMarco Jr. was putting all the profits

"up his nose." In addition, Scott testified that after

Callahan was arrested, DeMarco Jr. complained that he

(DeMarco Jr.) was supposed to receive the briefcase in which

Callahan had stored a quantity of cocaine to conceal it from

the DEA. The evidence was adequate to find that DeMarco Jr.

entered into an agreement to distribute cocaine and possessed

cocaine with intent to distribute it.

E. Philip Bargalla

Bargalla was convicted of conspiracy to distribute, but

acquitted of the substantive count of possession of cocaine

with intent to distribute (the "PWI" count) and instead

convicted of the lesser included offense of simple

possession. Bargalla argues that there was inadequate

evidence that he entered into a conspiracy to distribute and

that, especially in light of his acquittal of the PWI

offense, the conspiracy conviction must have resulted from

prejudicial "spillover." Bargalla argues that a conspiracy

cannot fairly be inferred from the facts that Bargalla took

possession of Callahan's briefcase after Callahan's arrest,

-30-

and was in possession of Callahan's car at the time it was

seized by the DEA.

The short answer is that additional evidence showed that

Bargalla was a regular purchaser of cocaine and marijuana

from Callahan and a distributer in his own right. For

example, Jeffrey Scott testified that he made about five

deliveries of marijuana to Bargalla from Callahan in 1987,

and Callahan confirmed that he sold cocaine and marijuana to

Bargalla on a regular basis beginning in late 1985 or early

1986. Moreover, there was evidence that Bargalla resold some

of the narcotics he acquired from Callahan. Scott testified

that he saw distribution paraphernalia -- a small scale and

chemicals such as Inositol that are used to mix with cocaine

to increase its volume -- in Bargalla's bedroom. Scott also

testified that Bargalla complained that people were not

paying him on time for the cocaine and marijuana that

Bargalla provided them.

This evidence was more than sufficient to support

Bargalla's conviction for conspiring to distribute cocaine

and marijuana. The testimony concerning the briefcase and

Callahan's car merely served to corroborate Bargalla's close

relationship with Callahan and his organization. The jury's

favorable treatment of him on the PWI count may or may not be

a windfall but it cannot be used to impeach the conspiracy

conviction. See United States v. Senibaldi, 959 F.2d 1131,

-31-

1135 (1st Cir. 1992) ("inconsistency in a criminal verdict is

not grounds for overturning it").

F. James Litterio

Litterio does not question the sufficiency of the

evidence to support his conviction for conspiracy. Instead,

he challenges the evidence with respect to count five, under

which he and Innamorati were convicted of possession with

intent to distribute cocaine on or about September 2, 1987.

We find the evidence sufficient.

The primary evidence supporting the possession charge

was the testimony of Tulowiecki, who described a four-ounce

purchase of cocaine by Litterio from Innamorati shortly

before September 2, 1987. Tulowiecki testified in detail

that he and Innamorati packaged four ounces of cocaine,

delivered the package to Litterio, and received the $5300

payment several days later. Tulowiecki also testified that

in the course of arranging this transaction Litterio said

that he wanted the four ounces of cocaine for his brother

Mark. In addition, in January 1989 Tulowiecki secretly

recorded a conversation with Litterio in which Litterio

referred to the four-ounce transaction.

Litterio argues at length that Tulowiecki's testimony

was inherently unreliable and uncorroborated. The

credibility of Tulowiecki's testimony was a matter for the

jury to resolve. As it happens, there was evidence that Mark

-32-

Litterio visited James Litterio immediately after the latter

acquired the drugs, and further evidence that Mark Litterio

was involved in the sale of four ounces of cocaine to

undercover officers just after James Litterio's four-ounce

purchase from Innamorati. The jury could easily conclude

that James Litterio provided the four-ounce package to Mark

after acquiring it from Innamorati.

G. Joseph Gilberti

Gilberti argues that evidence of "isolated sales" of

cocaine from Callahan or Scott to Gilberti is not sufficient

to convict Gilberti of participation in a conspiracy to

distribute. The evidence, however, showed more than mere

"isolated sales;" it showed that Gilberti was another cog in

the Callahan/Innamorati machine.

Scott testified that he delivered cocaine to Gilberti

for Callahan in 1986, generally in one to two-ounce

quantities. He testified that he made approximately 25 to 50

deliveries of this nature to Gilberti over a six-month

period, including one four-ounce delivery. Callahan

confirmed that Gilberti was one of the individuals to whom he

delivered cocaine. Gilberti developed a code with Scott and

Callahan so that he could order drugs over the telephone

without detection; he would refer to "green buckets of paint"

when ordering marijuana, and "white buckets of paint" when

requesting cocaine.

-33-

There was also evidence that the distribution of the

cocaine did not end when it reached Gilberti. Scott

testified that he gave Gilberti drug distribution

paraphernalia-- including a scale, ziploc bags and other

packaging, and sudocaine, a product used to mix with cocaine-

-and showed Gilberti how to use these items. Callahan

testified that Gilberti told him that he, Gilberti, had been

distributing cocaine to an individual named Ricky Green.

The evidence was adequate to support Gilberti's conviction

for conspiracy and possession of cocaine with intent to

distribute. The same evidence supported the forfeiture of

Gilberti's property under 21 U.S.C. 853, since his only

challenge to that forfeiture is that the evidence underlying

the conspiracy conviction was deficient.

IV. GRAND JURY TESTIMONY OF WILLIAM THOMPSON

On June 22, 1988, Thompson testified at length before

the grand jury about the drug distribution conspiracy in this

case. Thompson's testimony consisted almost entirely of the

government's recitation of a prior statement made by Thompson

to a DEA agent, interspersed at intervals with Thompson's

confirmation of the truth of the prior statement, sometimes

with qualifications. Some of this testimony incriminated

Thompson himself, but a great deal of the testimony

incriminated certain of his co-defendants, particularly

-34-

Innamorati. Thompson was subsequently indicted by the grand

jury along with the other defendants in this case.

At trial, Thompson elected not to testify. The court,

over defendants' objections, permitted the government to read

into evidence the entire transcript of Thompson's grand jury

testimony. Innamorati, Grady, Boisoneau and, surprisingly,

Thompson himself claim that this testimony was inadmissible

hearsay and that its introduction was reversible error. The

defendants also argue that the introduction of this evidence

violated their Sixth Amendment right to confront the

witnesses against them, but this amounts to the same argument

dressed in different garb.4

A. Admissibility

The basis for the district court's admission of

Thompson's grand jury testimony is not entirely clear from

the record. At one point, the court stated:

I'm going to allow . . . [the grand jury testimony]
in evidence and instruct the jury the conversations
pertaining to Thompson are admitted at this point
only against Thompson. Unless and until there is
other evidence that connects the other named

4The admission of an out-of-court statement falling
within a "firmly rooted" exception to the hearsay rule does
not violate the Confrontation Clause. See Bourjaily v.

United States, 483 U.S. 171, 182-83 (1987); Ohio v. Roberts,

448 U.S. 56, 66 (1980). Most courts have concluded that the
declaration against interest exception embodied in Fed. R.
Evid. 804(b)(3) is a "firmly rooted" exception to the hearsay
rule. See, e.g., United States v. York, 933 F.2d 1343, 1363-

64 & n.5 (7th Cir.), cert. denied, 112 S. Ct. 321 (1991).

Thus, the constitutional issue merges into the evidentiary
question.

-35-

defendants in this conspiracy, it's excluded
against them.

Shortly thereafter, in response to a renewed objection by

defense counsel, the court ruled that "the grand jury

testimony of William Thompson is allowed. It's allowed

against Thompson. It's a declaration against interest, and

I'll explain that to the jury." Id. at 62. No explanation

or limiting instruction was given to the jury.

The only argument urged by the United States in this

appeal to overcome the hearsay objection is that the grand

jury testimony was a declaration against interest. Fed. R.

Evid. 804(b)(3) excepts from the hearsay rule, when the

declarant is unavailable as a witness,

[a] statement which . . . so far tended
to subject the declarant to civil or
criminal liability . . . that a
reasonable person in the declarant's
position would not have made the
statement unless believing it to be true.

Thompson's invocation of the Fifth Amendment at trial

rendered him "unavailable" for purposes of Rule 804(b)(3).

See California v. Green, 399 U.S. 149, 168 n.17 (1970).

Under the exception, a declaration against interest is

admissible against anyone to whom the statement pertains.

See United States v. Myers, 892 F.2d 642, 644 (7th Cir.

1990).

Whether Thompson's grand jury testimony represents a

statement against penal interest poses the question how

-36-

broadly to define the concept of a "statement." One could

describe the entire grand jury testimony as a single

statement or, at the other extreme, could subdivide a single

sentence ("John and I robbed the bank") into two different

statements to be tested separately. Both the rationale of

the exception--the trustworthiness of the unit to be

admitted--and our own precedents yield no mechanical rule as

to where, in between these extremes, the line is to be drawn.

A further concern is that, even if a broad view is

taken as to the scope of the "statement," a co-defendant who

confesses to the authorities and inculpates another may be

seeking to curry favor and cast the main blame upon another.

Thus the "statement" as a whole may be very much in the

interests of the confessing party who is minimizing his or

her role. Some have urged a blanket exclusion of such

confessions as inherently untrustworthy; early drafts of Rule

804(b)(3) excluded "a statement or confession offered against

the accused in a criminal case, made by a codefendant or

other person implicating both himself and the accused." See

generally 4 Weinstein & Berger, Weinstein's Evidence,

804(b)(3) [03] at 804-152 & n.42 (1992).

We need not pursue these issues in depth. Thompson's

lengthy grand jury testimony contains only a few statements

that are directly against Thompson's penal interest--for

example, his descriptions of procuring the cellular phones

-37-

and checking license plate numbers--and even these could be

innocent acts, were context ignored. If these inculpatory

statements of Thompson were isolated from the rest, it would

be hard to say that the balance of the grand jury testimony,

especially the numerous accusations against Innamorati, were

against Callahan's interest. Thus if the directly

inculpatory statements are severed, little of the grand jury

testimony would be against Thompson's interest and admissible

against third parties.

If the inculpatory statements are not severed, the same

result prevails. Taken as a whole the testimony greatly

minimizes Thompson's own role in any wrongdoing. He admitted

a few acts of logistical assistance, doubtless hoping to

maintain (as he does here) that they were innocently

motivated. But the thrust of the testimony is that others

were guilty of wrongdoing from which Thompson himself had

been excluded but happened to have some knowledge. Although

later the extent of this knowledge could be turned into an

inference harmful to his interests, it is difficult to view

the testimony as a whole as consciously contrary to

Thompson's self-interest at the time it was made. "[F]or the

declaration to be trustworthy the declarant must have known

it was against his interest at the time he made the

statement". Filesi v. United States, 352 F.2d 339, 343 (4th

Cir. 1965).

-38-

In sum, the bulk of the testimony did not qualify as a

declaration against penal interest. As to Thompson, anything

he said constituted an admission so there was no error in

receiving the grand jury testimony as to him. Fed. R. Evid.

801(d)(2)(A). But as to the other defendants, most of the

testimony was both hearsay and outside the scope of Rule

804(b)(3)'s exception. We need not consider whether a

limiting instruction would have been a sufficient safeguard

to allow the testimony against Thompson but not the others,

compare Bruton v. United States, 319 U.S. 123 (1968), since

no such instruction was given.

B. Prejudice

Since error was committed in allowing the grand jury

testimony except as to Thompson, the only remaining question

is whether it was prejudicial as to the other defendants who

complain of its admission: Innamorati, Grady, and Boisoneau.

On direct appeal, in the case of a constitutional error (as

this one may be viewed in light of the Confrontation Clause),

the test for harmless error is a demanding one. The

appellate court must be persuaded beyond a reasonable doubt

that the jury's verdict was not attributable to the

challenged evidence. See Harrington v. California, 395 U.S.

250, 254 (1967); Milton v. Wainwright, 407 U.S. 371, 377-78

(1972); United States v. Figueroa, 976 F.2d 1446, 1455 (1st

Cir. 1992), cert. denied, 113 S. Ct. 1346 (1993).

-39-

This test is, and ought to be, stringently applied,

resolving all reasonable doubts against the government, since

it comes close to a trespass upon the jury's function. But

the case law is clear that, if the legitimate evidence

unquestionably assured the jury's verdict of conviction, the

error in admitting other evidence is not normally grounds for

reversal. Harrington, 395 U.S. at 256; Figueroa, 976 F.2d at

1455.5 Nor is this harmless error test confined to

inadmissible evidence so slight or duplicative that one can

assume that the jury scarcely noticed it. The wrongfully

admitted evidence must be "quantitatively assessed in the

context of other evidence presented . . . ." Sullivan, 61

U.S.L.W. at 4519 (quoting Arizona v. Fulminante, 111 S. Ct.

1246, 1264 (1991)). Even where the wrongfully admitted

evidence is singular and weighty, it can still be "harmless"

where the legitimate evidence is overwhelming. E.g., Clark

v. Moran, 942 F.2d 24, 27 (1st Cir. 1991).

Against this background, we conclude that the wrongful

admission of the grand jury testimony did not alter the

inevitable outcome of the case against Innamorati. We reach

this conclusion only after a careful scrutiny of the record,

5Errors that the Supreme Court deems to warrant
automatic reversal are rare. See, e.g., Sullivan v.

Louisiana, 61 U.S.L.W. 4518 (June 1, 1993) (improper

reasonable doubt instruction); Chapman v. California, 386

U.S. 18, 23 n.8 (1966) (denial of right to counsel or
partiality of trial judge).

-40-

for the grand jury testimony inculpates Innamorati in a

number of respects that are neither trivial nor literally

duplicative of other evidence. Among other things Thompson

testified that:

Mr. Innamorati sold marijuana while in high
school . . . . Around 1970 . . . [he] developed a
large distribution network which comprised of [sic]
many residents of Clinton and Lancaster,
Massachusetts.

[I]n 1985 Mr. Innamorati was arrested by the
Massachusetts State Police [while in possession of
cocaine and he later boasted that he] had paid his
attorney . . . several thousand dollars to fix the
charges against Mr. Innamorati.

[I]n the fall of 1987, [I] became aware that both
Innamorati and Tulowiecki purchased automatic
pistols and possessed these pistols when making
drug transactions. On several occasions, [I] saw
Innamorati and Tulowiecki before and after drug
deals and they were always carrying the pistols.

Tulowiecki also told [me] that Innamorati sent
Paula [sic] Bufton [Innamorati's companion] to the
corrections facility to visit Tulowiecki, and
during the meeting, Bufton told Tulowiecki that
Innamorati put aside one hundred thousand dollars
for any legal aid that Tulowiecki would incur . . .
. [Bufton told] Tulowiecki to be patient and
don't fold. That Tulowiecki would be taken care of
if he did the right thing.

Nevertheless, the case against Innamorati was

overwhelming and it is no accident that his "insufficiency of

the evidence" argument on this appeal is confined to

conclusory assertions. No less than seven persons testified

from personal knowledge that Innamorati was engaged in

cocaine and marijuana dealing, including among others his

partners (Callahan and Fitzgerald), his companion (Pamela

-41-

Bufton), and his lieutenant and record-keeper (Tulowiecki).

Drugs and money were confided by Innamorati to his friend

James Casasanto for safe-keeping when the authorities closed

in on the ring; and drugs, weapons, paraphernalia, and

records were found in the Edgewater apartment that Tulowiecki

maintained at Innamorati's behest.

In fact, the case against Innamorati--who stood at the

center of the ring's spider web--was a composite of

individual cases against other ring members, reinforced by

additional evidence against Innamorati. All of the other

ring members on this appeal played smaller parts but were

convicted on the conspiracy charge by the jury. Most of

these persons were not directly implicated by Thompson's

grand jury testimony or the testimony was at most duplicative

as to them. It defies belief that the jury, faced with the

aggregate of evidence against Innamorati, would have

acquitted him of conspiracy if the grand jury testimony had

been deleted from the record.

The remaining convictions against Innamorati stand on

the same footing. To establish a continuing criminal

enterprise under 21 U.S.C. 848, the government needed to

show only that Innamorati committed a continuing series of

violations of the federal narcotics laws and that he managed

or organized five or more individuals. See United States v.

David, 940 F.2d at 732. Without considering Thompson's

-42-

testimony, the evidence showed continuing violations and that

more than five persons acted at Innamorati's direction. The

individual possession counts against Innamorati were not

significantly bolstered by the Thompson testimony and the

weapons count--which Thompson corroborates--was supported by

ample and untainted evidence from other witnesses. We

conclude that the grand jury testimony was, as to Innamorati,

harmless beyond a reasonable doubt.

Turning to Boisoneau, Thompson's grand jury testimony

contains only two references to him. Near the conclusion of

his testimony, Thompson identified Boisoneau as one of

several "customers of Innamorati," and stated that he was

present at times when Innamorati supplied cocaine to these

customers. A short time later, Thompson testified that

Boisoneau and the other "customers" that he had identified

"were just weekend users," as opposed to distributors. Id.

at 114. These two statements were harmless beyond a

reasonable doubt in light of the abundant independent

evidence of Boisoneau's cocaine use and of his relationship

with Innamorati.

Tulowiecki testified that Boisoneau was one of

Innamorati's customers; that Tulowiecki had personally

delivered cocaine to Boisoneau; that Boisoneau was assigned

beeper number 004 in Innamorati's communications network; and

that Boisoneau visited Tulowiecki in prison and relayed a

-43-

message from Innamorati regarding the importance of "keeping

[Tulowiecki's] mouth shut." Records kept by Tulowiecki of

Innamorati's drug sales showed that Boisoneau purchased a

total of 19 grams of cocaine between September 1987 and

January 1988. Other witnesses, such as Pamela Bufton and

James Casasanto, also provided incriminating evidence.

Bufton, for example, testified that Boisoneau had aided in a

delivery of cocaine to Innamorati.

It is fair to say that, as to Boisoneau, Thompson's

testimony ("just [a] weekend user[]") was almost favorable.

That Boisoneau was a customer no one could fairly doubt. The

additional detail that made a conspiracy charge plausible

came almost entirely from others whom the jury chose to

believe.

Finally, as to Grady, we have scoured the thirty pages

of Thompson's grand jury testimony and are unable to find a

single reference to Grady. Grady in his brief does not

suggest any way in which he was directly prejudiced by the

admission of this evidence. We have no trouble, therefore,

concluding that the admission of the grand jury testimony was

harmless as to Grady.

V. VARIANCE

Boisoneau argues that a "variance" between the facts

alleged in the indictment and the facts adduced at trial

prejudiced his ability to defend the charges against him.

-44-

Although he uses the language of variance, Boisoneau's entire

argument is devoted to the contention that the government

introduced evidence at trial in addition to the evidence

listed as overt acts in the indictment and presented to the

grand jury.

The indictment sets forth 44 paragraphs of overt acts in

support of the alleged conspiracy. Paragraph 36 alleges

that, between May 1, 1987, and early 1988, Tulowiecki

distributed multi-ounce quantities of cocaine per month to

several buyers, including Boisoneau. Paragraph 37 alleges

that Tulowiecki's records show that Boisoneau purchased a

total of 12 grams of cocaine between September 27 and October

23, 1987. Boisoneau does not contend that the government

failed to prove these allegations at trial. Instead, he

argues that he was charged only with these acts, and that the

government "varied" from the indictment by offering

additional evidence, such as testimony that Boisoneau placed

cocaine in the trunk of a car that was to be driven to Maine

where Innamorati was staying, and testimony that Boisoneau

introduced Tulowiecki to two individuals who wanted to

purchase cocaine.

Boisoneau misapprehends the law. The government need

not recite all of its evidence in the indictment, nor is it

limited at trial to the overt acts listed in the indictment.

E.g., United States v. Ellender, 947 F.2d 748, 755 (5th Cir.

-45-

1991). The indictment charged all defendants, including

Boisoneau, with engaging in a conspiracy to distribute

cocaine and marijuana between 1984 and 1988. The evidence

complained of by Boisoneau falls squarely within the scope of

that alleged conspiracy, both temporally and substantively.

There is no variance.6

VI. RESTRICTIONS ON CROSS-EXAMINATION

A. Paul Callahan

Callahan was originally joined in the indictment as a

co-conspirator, but pleaded guilty prior to trial and was a

principal government witness at trial. Defendants sought to

impeach Callahan's credibility during cross-examination with

evidence that he had engaged in a wide of variety of criminal

acts throughout his life. The jury learned from the evidence

that Callahan had worked as a safecracker, that he was

convicted for a dozen specific acts of safecracking, that he

was a bookmaker, a bank robber, a burglar, a drug dealer, and

a perjurer, and that he spent much of his adult life--more

than sixteen years--in prison. But the court excluded

evidence relating to Callahan's participation in disposing of

6In discussing the supposed variance, Boisoneau also
alleges that the government failed to produce exculpatory
evidence and questions the district court's denial of a
motion for a bill of particulars. No effort is made to
develop these issues, however, and we do not address them.
Zannino, 895 F.2d at 17. For the same reason, we do not

discuss Innamorati's brief and conclusory claim of improper
variance.

-46-

the bodies of two homicide victims in the 1960's, and to

another incident in 1970 in which Callahan provided a

silencer to another individual who later used the silencer in

a shooting. Innamorati, Thompson, Grady, DeMarco Sr., and

DeMarco Jr. argue that this ruling improperly limited their

right of cross-examination and their Sixth Amendment right to

confront witnesses against them.

The trial judge apparently concluded that the references

to the homicides and silencer, events 20 to 30 years in the

past, were of limited importance in impeaching Callahan and

created a risk of prejudice that outweighed any benefit from

the evidence. The use of such ancient evidence merely to

show bad character for veracity is doubtful, cf. Fed R. Evid.

609(b)(10-year-old felonies presumptively excluded), and in

this case the excluded evidence was weak and largely

cumulative so far as it cast an unflattering light on

Callahan's character for veracity. Judgments of this kind

are very much within the trial court's discretion. See

United States v. Garcia-Rosa, 876 F.2d 209, 237 (1st Cir.

1989), cert. denied, 493 U.S. 1030, vacated on other grounds,

498 U.S. 954 (1990). We see no abuse in excluding the

evidence for this use.

There is a somewhat more substantial use that might have

been made of the evidence, namely, to suggest that Callahan

could still be prosecuted for involvement in homicides,

-47-

giving the government some hold over him. But there was no

indication when the questions were sought to be asked in this

case that the applicable statute of limitations still

permitted prosecution or, even if it did, that federal

authorities controlled the decision as to future prosecution.

It is not even clear that the prior bad acts were offered to

show that Callahan was subject to government pressure or that

this objective was squarely presented to the district judge.

In sum, we do not think that cross examination of

Callahan was unreasonably restricted. Similarly, since a

reasonable opportunity to test Callahan's veracity and

motives was offered, no Confrontation Clause issue is

presented. "Once the defendant has been afforded a

reasonable opportunity" for such an inquiry, "the trial judge

retains broad discretion in determining the scope or extent

of cross examination." Garcia-Rosa, 876 F.2d at 237.

B. Sean McDonough

Thompson challenges the district court's restrictions

upon his cross-examination of DEA agent Sean McDonough. At

trial, McDonough testified that the government had lost the

only copy of a "corrected statement" that Thompson had

provided to the DEA and that, according to Thompson,

contained material exculpatory evidence. This statement may

have been in McDonough's custody at the time it was

misplaced. On cross-examination of McDonough, Thompson's

-48-

counsel sought to show that, in a prior unrelated case, 86

seconds mysteriously had been erased from an audio tape in

McDonough's custody. The trial court sustained the

government's objection to this line of inquiry.

The intent of Thompson's counsel in inquiring about the

erased tape was to suggest to the jury that in both

instances--the missing 86 seconds and the misplaced DEA

statement--Agent McDonough had deliberately concealed or

destroyed material evidence. Counsel did not proffer any

proof that the missing portion of the tape had been linked to

misconduct by McDonough, nor was there any showing that the

corrected statement in this case had been deliberately

misplaced. Absent a foundation for this inquiry, the

district court was justified under Fed. R. Evid. 403 in

forbidding the question.

VII. QUASHING OF SUBPOENAS OF SPRINGFIELD POLICE OFFICERS

During direct examination, government witness Scott gave

the following account of an incident that allegedly occurred

during his cooperation with the DEA. On November 27, 1987,

prior to Callahan's agreement to cooperate with the

government, two DEA agents wired Scott with a hidden

recording device and brought him to a bar to meet and record

a conversation with Callahan. After the meeting, the agents

agreed to allow Scott to stop by his girlfriend's house

before returning to DEA headquarters. Scott went into the

-49-

house--leaving the agents waiting in the car outside--and was

arrested by officers of the Springfield police department who

coincidentally were raiding the house as part of an unrelated

investigation.

According to Scott's testimony, one officer searched

Scott and found nothing. Then a second officer searched

Scott and purported to find vials of cocaine. Scott was

taken to police headquarters and charged with possession of

cocaine with intent to distribute. Scott testified that he

did not have any cocaine in his possession on this occasion,

and would never have carried cocaine in such a situation

since he knew it was standard procedure for the DEA agents to

search him thoroughly each time he returned to the vehicle.

Scott testified that after being released by the Springfield

police officers he contacted the DEA agents to complain about

the arrest--he thought at first that the arrest had been a

ploy by the DEA, in conjunction with the Springfield police,

to get him "under their thumb"--and that subsequently the

charges were dismissed and he was not prosecuted.7

Following this testimony, several of the defendants

sought to subpoena the Springfield police officers involved

in this incident in an attempt to prove that Scott did in

7The DEA agents testified that they too were approached
by Springfield police officers while waiting in their car in
front of the house. Not wanting to expose Scott's role in
the investigation, they quickly departed.

-50-

fact possess cocaine on that evening. The district court

quashed the subpoenas, finding that the proposed testimony

was inadmissible under Fed. R. Evid. 608(b), which provides

that "[s]pecific instances of the conduct of a witness, for

the purposes of attacking or supporting the witness'

credibility, other than conviction of a crime as provided in

rule 609, may not be proved by extrinsic evidence."

Defendants argue that the officers' proposed testimony

was not excluded by Rule 608(b), because defendants did not

seek merely to impeach Scott's credibility through extrinsic

evidence of a prior bad act but also sought to contradict a

specific assertion made by him during his direct testimony,

thereby showing that he had lied before the jury in the very

case. Nevertheless, the proposed contradiction involved a

matter collateral to the main issues in this trial, since the

Springfield incident did not in any way involve any of the

defendants or the charges against them. A court may, indeed

normally does, preclude a party from proving with extrinsic

evidence that a witness lied in court on a collateral matter.

See United States v. Tejada, 886 F.2d 483, 489 (1st Cir.

1989); Walker v. Firestone Tire & Rubber Co., 412 F.2d 60, 63

(2d Cir. 1969). Here, the district court was justified in

preventing a major detour into this essentially irrelevant

episode.

-51-

Defendants say that the Springfield officers' testimony

was relevant because it showed that Scott continued to use

cocaine even after his cooperation with the DEA, which

rebutted his testimony that he contacted the DEA because he

"knew what we were doing was totally and completely wrong"

and wanted "to make things right." But Scott admitted on

cross-examination that he used cocaine long after he began to

cooperate with the DEA, in fact up until a couple of months

prior to the trial. Thus, the Springfield episode was at

best cumulative evidence, and given the diversion involved to

procure it, properly excluded as duplicative on this issue.

Any claim by Scott as to the purity of his motive was

undoubtedly discounted by the jury since Scott received

$250,000 from the government, as well as other benefits.

VIII. BELATED PRODUCTION OF DEA NOTES, AND
TESTIMONY OF DEA AGENT O'BRIEN

Edward O'Brien was a DEA agent who was involved in the

early investigation of this case, but subsequently left the

DEA under some sort of cloud; the circumstances of his

departure from the agency are unclear. Early in the

proceedings, the court granted the government's motion to

exclude any reference to O'Brien at trial, stating: "I don't

want him coming in and the government being prejudiced

against [sic] because they had an agent who turned out bad.

So we will kick that out."

-52-

On the fifth day of trial, after the court made its

initial decision to exclude O'Brien, the government produced

to defendants notes made by DEA Agents McDonough and O'Brien

during their initial debriefing of Scott. Contained within

these documents was a notation that arguably reads "driver

for Fitzgerald = Wall." Grady argued that the notes tended

to exculpate him, since he was accused of being the truck

driver for the conspiracy. His theory was that the notes

indicated that the truck driver was actually an individual

named Wally Barrett, whose name had surfaced on other

occasions during the trial.

Grady questioned Agent McDonough about the notation but

McDonough testified that he was not present during the entire

debriefing, that he believed this particular notation was

made by Agent O'Brien, and that he (McDonough) knew nothing

about it. Grady then asked the court either for dismissal or

a mistrial based on the belated disclosure of the exculpatory

evidence or, alternatively, for permission to call Agent

O'Brien in light of these new developments. The court denied

both of these requests. Grady argues, first, that the

belated disclosure of the DEA notes violated Brady v.

Maryland, 373 U.S. 83 (1963), and deprived him of fair trial;

and second, that the court's exclusion of Agent O'Brien

further compounded this violation.

-53-

We agree that the "Wall" notation constituted

exculpatory evidence within the meaning of Brady. It

provided Grady with a basis for arguing, or at least

developing evidence to show, that "Wally" and not Grady was

the truck driver. However, in cases of belated disclosure,

as opposed to outright non-disclosure, of exculpatory

evidence, "the critical inquiry is . . . whether the

tardiness prevented defense counsel from employing the

material to good effect." United States v. Devin, 918 F.2d

280, 290 (1st Cir. 1990). Here, the notation was produced

early in the trial, well before the start of defendants' case

(indeed, prior to cross-examination of the government's first

witness). We do not believe that Grady was prevented from

making good use of the information or otherwise prejudiced by

the delay.8

Although Grady argues that he was prejudiced by being

deprived of the opportunity to investigate the "Wall"

reference prior to trial, he never asked the trial court for

a continuance to allow him to investigate the reference. We

have held it "incumbent upon a party faced with such a

situation to ask explicitly that the court grant the time

8There is no indication that the notation was withheld
in bad faith or deliberately suppressed. The disputed
notation consists of one line in a voluminous collection of
notes; the notation itself is difficult to decipher and is
subject to different readings. Its exculpatory nature--even
assuming defendants' reading is the correct one--is not
immediately apparent.

-54-

needed to regroup, or waive the point . . . ." United States

v. Diaz-Villafane, 874 F.2d 43, 47 (1st Cir.), cert. denied,

493 U.S. 862 (1989). Nor has Grady described any specific

avenue of investigation that would have been pursued had the

notation been disclosed earlier. Accordingly, we conclude

that the belated disclosure of the "Wall" notation did not

prejudice Grady and does not entitle him to a new trial.

Grady contends that at the very least he should have

been permitted to call Agent O'Brien to the stand to question

him about the notation. The government's unsupported

response that O'Brien "likely had little to add concerning

the notes of the Jeffrey Scott debriefing" is not at all

comforting. What O'Brien might have added is that Scott did

say that the driver referred to was Wally Barrett,

information that would be helpful to Grady if it were

admissible for its truth. But Scott's statements to O'Brien

during the debriefing would have been inadmissible hearsay if

offered for their truth (as opposed to impeachment). Thus,

the exclusion of O'Brien did not prejudice Grady in this

respect.

The only apparent use that Grady could have made at

trial of the "Wall" notation would have been to impeach

Jeffrey Scott's testimony. Scott testified that he did not

know the name of Innamorati's driver; Grady could have asked

him on cross-examination whether he recalled telling the DEA

-55-

that the driver's name was Wally. Grady sought to call

O'Brien to the stand to question him about the notation, but

he never sought to recall Scott for further cross -

examination once the notes were produced. If Scott had been

asked about the "Wall" statement and denied making it, then

Grady might have been entitled to call O'Brien in an effort

to prove that Scott in fact made the statement. Absent any

effort by Grady to cross-examine Scott on the point, we

cannot see how the court's refusal to involve O'Brien

prejudiced Grady.9

IX. PAYMENTS TO WITNESS

Scott, a key witness for the prosecution, received

$250,000 from the government prior to trial for his

cooperation as well as immunity from prosecution and

enrollment in the federal witness protection program. The

$250,000 payment was made pursuant to a DEA program that

awards twenty percent of the value of seized assets to

parties who are instrumental in successful investigations.

9Grady also complains of the district court's denial of
his motion for a mistrial based on a violation of the court's
sequestration order. The violation occurred when the
government permitted Fitzgerald and Callahan to converse
together in the prosecutor's office after Callahan's
testimony but prior to Fitzgerald's. The district court held
a voir dire, rebuked the government, but refused to declare a
mistrial. Briefly addressing this issue, Grady provides no
persuasive explanation for his claim of prejudice and we do
not think that the trial court abused its discretion in
denying the mistrial motion. See United States v. Rossetti,

768 F.2d 12, 16 (1st Cir. 1985).

-56-

Gilberti argues that these benefits conferred upon Scott were

so likely to induce perjury that they infringed upon

defendants' right to a fair trial, and he points to our

dictum in United States v. Dailey, 759 F.2d 192 (1st Cir.

1985), that "we can think of no instance in which the

government would be justified in making a promised benefit

contingent upon the return of an indictment or a guilty

verdict." Id. at 210 (footnote omitted).

Subsequently in United States v. Cresta, 825 F.2d 538

(1st Cir. 1987), cert. denied, 486 U.S. 1042 (1988), this

court upheld an agreement much like that in this case. In

Cresta a government witness was promised $50,000 from the

sale of a vessel that was to be seized and forfeited to the

government as a result of the witness's cooperation. Cresta

relied upon the facts that the terms of the agreement were

disclosed to defense counsel and explored on cross-

examination; there was substantial corroboration of the

witness's testimony; and the court admonished the jury to

weigh carefully the credibility of accomplice testimony. See

id. at 546.10

Those same facts are present in this case. The terms of

the agreement were not concealed; to the contrary,

10See also United States v. Wilson, 904 F.2d 656 (11th

Cir. 1990) (testimony by government witnesses who could
potentially recover up to $11 million held not to violate due
process), cert. denied, 112 S. Ct. 250 (1991).

-57-

defendants' counsel questioned Scott closely about his

arrangements with the government, and argued at length in

closing that Scott should be disbelieved as a result of them.

There was evidence to corroborate virtually every aspect of

Scott's testimony. And the court instructed the jury to

consider carefully any inducements or advantages that any

witnesses had received. Finally, the $250,000 payment to

Scott was completed several days prior to trial, and the

payment was thus not directly dependent upon the result of

Scott's testimony in court.

Clearly such immense payments are troubling. The

payments may be for "information," rather than for later

testimony or convictions, but the steps are linked and the

inducement to testify in accordance with prior reports is

obvious. Yet defendants are regularly convicted based on

testimony secured by the prosecutor's decision to reduce or

dismiss charges against testifying co-defendants. In fact,

Congress has enacted statutes that directly reward those who

disclose misconduct and who doubtless testify for the

-58-

government in the ensuing trials.11 In all events, Cresta

is the governing law in this circuit and controls this case.

X. COMMENTS BY THE PROSECUTION

Boisoneau alleges that he was unfairly prejudiced by

improper comments made by the prosecutor during closing

argument. First, Boisoneau challenges the following passage

from the prosecutor's rebuttal argument at the close of the

case, in which the prosecutor sought to justify the

government's $250,000 payment to Scott in exchange for his

cooperation:

What did the government know before Jeffrey Scott
walked into the [DEA] in contrast to what the
government knew as a result of Jeffrey Scott's
cooperation? And even on pure dollars and cents,
consider the amount of forfeitures, the seizures
that it led to. But go beyond that, because if you
do a cost benefit analysis you must also consider
the cost that was saved to society by dismantling
an operation like the one you've heard about
here. . . .

Boisoneau made no objection to these remarks during trial,

and our review is therefore limited to plain error. Fed. R.

Crim. P. 52(b).

11"[R]ewards for assistance are essential to the
business of detecting and punishing crime." United States v.

Bringham, 977 F.2d 317, 318 (7th Cir. 1992). See, e.g., 31

U.S.C. 3730(d) (providing for an award of up to 10 percent
of the proceeds of suit to any individual whose provision of
information leads to government's recovery of funds under the
False Claims Act, 31 U.S.C. 3729); 26 U.S.C. 7623
(providing for Secretary of Treasury to make awards "for
detecting and bringing to punishment persons guilty of
violating the internal revenue laws").

-59-

Boisoneau now argues that the prosecutor's statement was

an improper allusion to facts not in the evidence, namely, to

some actual cost-benefit analysis commissioned by the

government showing the advantages and disadvantages of the

payment to Scott. These remarks do not suggest to us that

some actual cost-benefit analysis was undertaken: they are

nothing more than an argument, using the latest fashionable

jargon, that the payment was reasonable in light of the

results obtained. The prosecutor's own language--"if you do

a cost benefit analysis"--shows that he was merely suggesting

a way for the jury to look at the payment.

Boisoneau also objects to the prosecutor's statement in

closing that the trial judge alone would determine the

sentences for each of the cooperating witnesses, and that the

jury therefore should not think that the witnesses were

getting "a walk." Boisoneau points out that in fact the

government had dismissed, or elected not to assert, numerous

criminal charges against many of the cooperating witnesses

and also had promised to make motions for downward departures

with respect to certain witnesses. Therefore, Boisoneau

argues, the government in fact had far more significant

influence on the witnesses' ultimate sentences than the

prosecutor's disclaimers would suggest.

We agree that the prosecutor's statement told only half

the story, but it is usually the function of opposing counsel

-60-

to remind the jury of the other half. Indeed, witnesses are

normally cross-examined as to just such inducements. Perhaps

in some instances a prosecutor's incomplete version of events

might involve so much distortion that a cautionary

instruction by the trial judge would be required. In this

instance, no objection was made at the trial nor any

instruction sought, and there is no "plain error" here in the

court's failure to give such an instruction sua sponte. We

have similarly examined Boisoneau's other claims of

prejudicial error arising out of the prosecutor's closing

arguments and find them unpersuasive.

Nor do we see any merit in Thompson's suggestion that

the prosecutor's closing argument contained improper

"vouching" for the government's witnesses. The line between

the legitimate argument that a witness's testimony is

credible and improper "vouching" is often a hazy one, to be

policed by the trial court in the first instance. See United

States v. Martin, 815 F.2d 818, 822-23 (1st Cir.), cert

denied, 484 U.S. 825 (1987). Here, at worst the challenged

remarks -- for example, the prosecutor's statement that

"[t]he testimony of the witnesses in this case is well

corroborated . . . [a]nd as a result, you know that the

witness's testimony is true" -- fell in the grey area.

Thompson did not object to the remarks at trial when a

-61-

curative instruction might have been given, and we think that

is the end of the matter.

XI. FAILURE TO PRESERVE EVIDENCE

Thompson argues that his due process rights were

violated by the government's failure to preserve exculpatory

evidence, specifically a DEA-6 form prepared by Agent

McDonough summarizing an interview with Thompson. It appears

that McDonough interviewed Thompson on March 10, 1988, and

then memorialized the interview on the DEA-6 form. On June

22, 1988, just prior to Thompson's appearance before the

grand jury, McDonough again met with Thompson, and Thompson

made certain handwritten corrections on the form and then

signed it. In the grand jury, the government attorney read

each statement on the DEA-6 form to Thompson, and then asked

Thompson to confirm the truth of the statement. Thompson did

so, making some modifications or corrections. The form with

Thompson's handwritten corrections was lost after the grand

jury appearance.

Thompson filed a motion to dismiss the indictment on the

ground that the DEA-6 form as corrected by him prior to the

grand jury appearance was material exculpatory evidence, and

that the government's failure to preserve that evidence

deprived him of a fair trial. This motion was denied by the

magistrate judge to whom it was referred. The magistrate

judge's report advised the parties that pursuant to the local

-62-

rules the failure to file written objections to the report

within ten days "shall preclude further appellate review by

the Court of Appeals." Thompson failed to file a written

objection. The issue, therefore, was waived. See Thomas v.

Arn, 474 U.S. 140, 155 (1985); United States v. Valencia-

Copete, 792 F.2d 4, 6 (1st Cir. 1986).

Although we will address waived issues where necessary

to prevent a miscarriage of justice, we certainly perceive

none here. The corrected DEA-6 form was essentially

preserved by the grand jury testimony itself, during which

the government attorney went through the form line-by-line.

The transcript of this grand jury testimony was read to the

jury at trial.

XII. JURY INSTRUCTIONS

Several defendants--Thompson, Letters, Litterio and

Boisoneau--challenge various aspects of the district court's

charge to the jury.

First, Thompson argues that the court erred by denying

his request for an instruction stating that the motor vehicle

licenses and registrations were public documents. As already

noted, one of the crucial pieces of evidence linking Thompson

to the conspiracy was his provision to Innamorati of registry

checks on the license plates of vehicles of which Innamorati

was suspicious. Thompson asked that the jury be told that

"as a matter of law, motor vehicle licenses and registrations

-63-

are public documents, and disclosure of their contents does

not, in itself, violate the law."

The only case on the point cited in Thompson's brief,

Doe v. Registrar of Motor Vehicles, 26 Mass. App. Ct. 415,

528 N.E.2d 880 (1988), actually stands for the proposition

that the motor vehicle registry is not prima facie a public

record. In any event, the government did not charge Thompson

with stealing government secrets; it was enough for it to

show that Thompson's behavior in facilitating access to the

registry was part of the conspiracy. There is no indication

that the instructions as a whole misled the jury as to what

was needed to convict on the conspiracy count.

Second, Thompson challenges the district court's refusal

to instruct that "mere proof of a buyer-seller relationship

is not enough to convict one as a co-conspirator on drug

conspiracy charges." This instruction is at best an

incomplete statement of the law of conspiracy. Depending on

the surrounding circumstances, a buyer-seller relationship

could, in some cases, be the very core of a drug distribution

conspiracy. See Moran, 894 F.2d at 1302-04. For this

reason, courts that have approved the "buyer-seller"

instruction have restricted its use to cases in which the

evidence showed only a single or a very limited number of

sales for personal use. See United States v. Canino, 949

F.2d 928, 941 (7th Cir. 1991), cert. denied, 112 S. Ct. 1701,

-64-

1940 (1992); United States v. Medina, 944 F.2d 60, 65-66 (2d

Cir. 1991), cert. denied, 112 S. Ct. 1508 (1992).

In this instance, the gist of the conspiracy charge

against Thompson was not his drug purchases as such but his

other affirmative acts--notably, procuring cellular phones

and performing license plate checks--that the government said

were knowingly designed to assist Innamorati's extensive drug

ring operations. We doubt whether the instruction Thompson

sought is well tailored even for a case in which the

conspiracy charge focuses on multiple purchases and the

"defense" is personal use. The instruction is even less

appropriate for the case actually presented against Thompson.

Finally, Thompson complains in a cursory fashion of the

trial court's responses to several questions posed by the

jury during its deliberations. For example, although

Thompson argues that a supplementary instruction on

conspiracy was a "misstatement" of law, he fails to tell us

how the statement was inaccurate. We find no prejudicial

error here, nor with respect to each of Thompson's remaining

objections to the judge's handling of the jury's inquiries.

Next, Letters says that the court's supplemental

instruction on the definition of "aiding and abetting," in

response to a jury inquiry on the fourth day of

deliberations, failed to tell the jury that some affirmative

participation on the part of the defendant is required for

-65-

conviction. Letters failed to object to the challenged

language at trial. Once again confining our review to a

search for plain error, we find none. The supplemental

instruction adequately informed the jury of the requisite

level of participation required to convict for aiding and

abetting. Letters' underlying concern--that the jury be told

that merely purchasing cocaine for personal use does not aid

and abet the seller's possession with intent to distribute--

was specifically addressed by the court in the supplemental

instruction immediately after the portion Letters challenges.

Finally, Litterio and Boisoneau claim as error the

district court's refusal to give their requested "accomplice

testimony" instruction. From reading their briefs, one might

get the impression that no "accomplice testimony" instruction

was provided. In fact, the court admonished the jury at

length on the need to weigh carefully the uncorroborated

testimony of an accomplice and to consider the advantages

that such witnesses might receive in exchange for their

testimony. The court is not required to track the

defendants' requested language so long as the jury is fairly

informed of the pertinent law, United States v. Newton, 891

F.2d 944, 951 (1st Cir. 1989), as it was in this instance.

XIII. ADMISSION OF "DRUG LEDGER" AND TELEPHONE SUMMARIES

Thompson devotes a half page in his brief to an argument

that the court abused its discretion by allowing the

-66-

government to introduce two items of evidence: first, a

"ledger" and related evidence summarizing certain of the drug

sales made by Tulowiecki; and second, evidence of telephone

calls between various telephone numbers associated with the

alleged conspiracy, as well as summary charts of that

information.

The drug "ledger" was a book maintained by Tulowiecki

for about a month in the fall of 1987, in which Tulowiecki

recorded cocaine sales, showing the purchaser (by code

number), the amount of narcotics bought, the price and the

date. When not using the ledger, Tulowiecki frequently

recorded cocaine sales on slips of paper, a number of which

were also introduced into evidence. In addition, Tulowiecki

prepared for use at trial a summary of the transactions that

were recorded in the ledger and on the slips of paper.

Defendants did not object at trial to the introduction of the

ledger and original papers, but they did object when the

government sought to introduce Tulowiecki's summary.

Thompson's brief does not identify any basis for concluding

that the admission of these materials was error.

The telephone evidence consisted of frequency reports

showing the number of calls between various telephone numbers

of persons and businesses associated with the conspiracy, as

well as charts summarizing that information. Many courts

have admitted this type of evidence in conspiracy cases.

-67-

E.g., United States v. Porter, 821 F.2d 968, 975 (4th Cir.

1987), cert. denied, 485 U.S. 934 (1988); United States v.

Drougas, 748 F.2d 8, 25-26 (1st Cir. 1984). Thompson argues

that the telephone records did not identify the specific

persons who made or received the calls; but this merely

limits and does not eliminate their relevance. Thompson also

says that "testimony and exhibits made it clear that the

compilation of numbers [in the government's summaries] did

not match the phone records." But Thompson fails either to

specify any respects in which the summary materials were

inaccurate or to cite us any such "testimony and exhibits."

XIV. "GUILT ASSUMING HYPOTHETICALS"

Thompson argues that he is entitled to a new trial on

account of the prosecutor's use, in Thompson's phrase, of

"guilt assuming hypotheticals" during redirect examination of

Lancaster Police Chief Eric Mcavene. During cross

examination of Mcavene, Thompson's counsel sought to

establish that it was a common practice for police officers

to run registry checks on license plates, and that such

checks were done for many different reasons including

requests from the public. Mcavene admitted that registry

checks were conducted for a variety of reasons and that he

was not consulted in every instance.

In response, government counsel sought to dispel the

notion that registry information was freely disseminated.

-68-

Pursuing that theme, the prosecutor asked Mcavene, "[I]f a

known drug dealer had asked you for a Registry check, would

you do it for him?" Before the witness could answer, the

court upon objection ruled (mistakenly) that this question

had already been asked. The prosecutor acquiesced and moved

on to his next inquiry: "[I]f William Thompson had asked you

for the Registry check would you have done it?" The court

sustained Thompson's objection to this question, struck the

question, and denied Thompson's motion for a mistrial.

It may be a close call whether either of these questions

was improper as an implied assertion that Thompson was a drug

dealer, but we need not pursue the issue. Even if both

questions were error, they did not conceivably have such a

prejudicial impact as to require reversal. Neither question

was answered by the witness, one was stricken from the

record, and the court elsewhere instructed the jury that

statements of counsel are not evidence. The precise limits

on who could obtain registry checks was largely a side-show

and Mcavene's attitude toward disclosure was a subject raised

by Thompson's own counsel.

XV. MARK LITTERIO EVIDENCE

Litterio argues that the court erred by permitting the

government to introduce evidence of a drug transaction

involving Litterio's brother, Mark Litterio, as well as a

statement made by Mark Litterio to an undercover officer.

-69-

Litterio was convicted under count five of the indictment for

possession of cocaine with intent to distribute. The primary

evidence was Tulowiecki's testimony that Litterio purchased

four ounces of cocaine from Innamorati in late August 1987.

According to Tulowiecki, Litterio said at the time of the

purchase that he was buying the cocaine for his brother Mark.

To corroborate this testimony, the government offered

testimony from a parade of police officers showing that Mark

Litterio and an accomplice were involved in the sale of four

ounces of cocaine just after James Litterio's purchase from

Innamorati.

Although the evidence of the Mark Litterio transaction

was a major detour, the evidence was relevant to the charge

against Litterio in count five. The fact that Mark Litterio

sold four ounces of cocaine to undercover agents just after

James Litterio bought the same amount from Innamorati

strongly corroborated Tulowiecki's testimony. The only

"prejudice" was the potential for distracting the jury with

details of an uncharged crime, and this judgment is largely

within the discretion of the trial judge. See United States

v. Bonneau, 970 F.2d 929, 935 (1st Cir. 1992) ("only rarely--

and in extraordinarily compelling circumstances" should this

court "reverse a district court's on-the-spot judgment

concerning the relative weighing of probative value and

unfair effect").

-70-

Litterio also challenges as hearsay the admission,

through the testimony of one of the officers involved in the

Mark Litterio undercover investigation, of Mark Litterio's

contemporaneous statement that he was doing the four-ounce

cocaine deal with his brother "Mickey" (James Litterio's

nickname). This statement, however, was admissible against

Litterio under Fed. R. Evid. 801(d)(2)(E), which excludes

from the definition of hearsay "a statement by a

coconspirator of a party during the course of and in

furtherance of the conspiracy." Litterio objects that there

is nothing to show that Mark himself was a member of the

Innamorati ring. But based on this single transaction James

and Mark Litterio were evidently engaged in a conspiracy in

which James supplied, and Mark sold, four ounces of

cocaine.12 Mark Litterio's statement to the undercover

officers was in furtherance of it. Whether this was a

separate conspiracy or part of the larger Innamorati

conspiracy makes no difference so far as the admissibility of

the statement against James Litterio is concerned.

XVI. REFERENCES TO "THE DEMARCOS"

12Mark Litterio's statement itself may be considered in
determining admissibility, see Bourjaily v. United States,

483 U.S. at 178-79, and in addition there was evidence that
James Litterio stated to Tulowiecki that he (James Litterio)
needed the four ounces for his brother Mark, and that Mark
Litterio was followed to James Litterio's house immediately
after James Litterio received the drugs from Tulowiecki.

-71-

Robert DeMarco Jr. argues that he was deprived of a fair

trial by repeated references to "the DeMarcos." He contends

that these collective references deprived him of an

individual adjudication of guilt or innocence, and instead

grouped him together with his father as a single entity.

We have examined the record and conclude that the phrase

"the DeMarcos" was used as a substitute for "both Robert

DeMarco Sr. and Robert DeMarco Jr.," and that this was made

clear to the jury. For example, in one of the instances

cited by Demarco Jr., Callahan testified that he distributed

portions of two half-kilograms of cocaine to, among others,

"the Demarcos." Upon counsel's objection to the collective

reference, the prosecutor asked whether Robert DeMarco Sr.

and Robert DeMarco Jr. "were both present" at the time of

this distribution, and Callahan replied, "Yes."

A witness may testify that two persons jointly performed

a given act so long as confusion is avoided. Here, the

witness was merely using the shorthand phrase "the DeMarcos"

to refer to "both Robert DeMarco Sr. and Robert DeMarco Jr."

When counsel objected, the witness made clear his meaning.

We have examined the other instances cited by DeMarco Jr. and

find them to be equally lacking in confusion or prejudice.

XVII. EX PARTE PROCEEDINGS

After the trial concluded, the government discovered

information in its possession that related to an incident

-72-

recounted during the trial testimony of a government witness.

Although the government believed that the information was not

Brady material, it did not wish to conceal the information

from the court or take the final responsibility for

appraising its importance. At the same time, the government

feared that release of the information would pose a

substantial danger of serious harm.

Accordingly, the government submitted the information to

the district court ex parte, described the reasons for its

position and explained why it feared disclosure. The

district court ruled that the information was not material

and that the government's justification for non-disclosure

was persuasive. The district court sealed its order

containing these rulings. At no time during this episode

were defendants or their counsel made aware of these

proceedings or of the court's order.

The government's submission and the district court's

order were forwarded to this court and brought to the

attention of this panel. This court in turn issued an order

on November 18, 1992, informing all defense counsel of the

existence of the ex parte proceedings. Not surprisingly,

defendants have moved for disclosure of the information, or

at the very least a synopsis of the information so that they

may argue intelligently as to its materiality and the need

for disclosure. Certain defendants also argue that the ex

-73-

parte procedures utilized by the district court deprived them

of a fair trial.

We sympathize with defendants' protestations and agree

that the procedures utilized in this case raise extremely

serious issues. Outside of emergencies, see Fed. R. Civ. P.

65(b) (temporary restraining orders), the ex parte submission

of information from a party to the court and the court's

ruling on that information without notice to or participation

of the opposing party is fundamentally at odds with our

traditions of jurisprudence, Haller v. Robbins, 409 F.2d

857, 859 (1st Cir. 1969), and can be justified only in the

most extraordinary circumstances. Nevertheless, in rare

situations requirements of confidentiality outweigh the

interest in adversarial litigation and permit a court to rule

on an issue in camera without the participation of an

interested party.

For example, in United States v. Perkins, 926 F.2d 1271

(1st Cir. 1991), the government possessed information that

was arguably useful to impeach a government witness, but

whose disclosure would have jeopardized an ongoing criminal

investigation. The government submitted the information to

the district court for an in camera determination of its

materiality. The court concluded that the information was

not material and need not be disclosed. After trial--

presumably after the threat to the investigation had ceased--

-74-

the government's ex parte submission was unsealed and the

defendant was for the first time apprised of the information.

On appeal we upheld the court's finding of immateriality and,

implicitly, the procedure employed.

There are other examples. Fed. R. Crim. P. 16(d)(1)

expressly authorizes the court to deny discovery of

information sought by a defendant based on an ex parte

showing by the government of the need for

confidentiality.13 The Classified Information Procedures

Act, 18 U.S.C. App. 1-16, permits the ex parte submission

of affidavits by the government in support of a protective

order authorizing the non-disclosure of national security

information. See United States v. Pringle, 751 F.2d 419, 427

(1st Cir. 1984). And under Franks v. Delaware, 438 U.S. 154

(1978), courts often make an in camera assessment of the

veracity of a confidential government informant and the harm

from revealing his identity. See United States v. Southard,

700 F.2d 1, 10-11 (1st Cir.), cert. denied, 464 U.S. 88

(1983).

The present case is unusual because not only were

defendants denied access to the material but they did not

even know of its submission to the court. We agree that the

13See e.g., United States v. Napue, 834 F.2d 1311, 1317

(7th Cir. 1987) (approving this procedure in appropriate
cases). Rule 16(d)(1) requires the court to preserve the
records of the ex parte communication for the appellate court

in the event of an appeal, as was done in this case.

-75-

secret submission to the court is especially dangerous,

depriving the opponent even of the opportunity to argue

generally against the need for secrecy. Yet there is no

question here of convictions based upon secret evidence

furnished to the factfinder but withheld from the defendants.

What the government did was to provide material to the court

to permit the court to determine whether under applicable law

the material needed to be produced to the other side and,

collaterally, to determine whether there was a legitimate

reason for continued secrecy in the submission.

Each of the three judges on this panel has considered

the information in this case bearing on these two issues.

Our standard in this inquiry was to resolve every legitimate

doubt in favor of the defendants precisely because they could

not argue the matter for themselves. We nevertheless have

concluded that there was a substantial threat of serious harm

warranting the initial examination by the district court

without notice to defendants; that the threat has abated

sufficiently to justify notice to the defendants now but not

the disclosure of the information itself; and that the

information, whether or not technically Brady material, would

not have significantly assisted any of the defendants and

could not conceivably have altered any of the verdicts.

As for the government's action in submitting the

information to the district court without notice to

-76-

defendants, we would expect this dangerous course to be very

rare indeed, but in this instance we find that it was

justified and, given the unimportance of the material, it

inflicted no prejudice on the defendants. No doubt we could

construct a judicial rule forbidding the government, absent a

statute or regulation, from making any secret submission.

But we think that the interests of justice are better served

by encouraging the government to let the district court

resolve the Brady issue or like questions in close cases.

Defendants in general would not gain from a regime that

encouraged the government to decide the matter itself.

XVIII. SENTENCING ISSUES

A. Introduction

Thompson, DeMarco Sr., Letters, Litterio and Boisoneau

challenge the district court's calculation of their sentences

under the Sentencing Guidelines.14 Many of defendants'

arguments concern the court's calculation of the amount of

narcotics attributable to each defendant. It is useful to

say a few words on the subject at the outset.

Under the Guidelines, the sentence for a drug-related

offense hinges substantially upon the total amount of drugs

involved in that offense. See U.S.S.G. 2D1.1(c) (drug

14The district court applied the 1990 version of the
Sentencing Guidelines and therefore all citations unless
otherwise indicated are to that version.

-77-

quantity table).15 This determination often turns on the

"relevant conduct" provision of the Guidelines, which

provides that a defendant's base offense level shall be

determined on the basis of "all acts and omissions committed

or aided and abetted by the defendant, or for which the

defendant would be otherwise accountable, that occurred

during the commission of the offense of conviction . . . ."

U.S.S.G. 1B1.3(a)(1). In the case of concerted criminal

activity, conduct "for which the defendant would be otherwise

accountable" includes "conduct of others in furtherance of

the execution of the jointly-undertaken criminal activity

that was reasonably foreseeable by the defendant." Id.

comment note 1.

Thus, "[t]he central concept . . . is foreseeability."

United States v. O'Campo, 973 F.2d 1015, 1023 (1st Cir.

1992). This means that each member of a drug distribution

conspiracy may be held accountable at sentencing for a

different quantity of narcotics, depending on the

circumstances of each defendant's involvement. See U.S.S.G.

1B1.3 comment note 1. The foreseeability determination is

15Section 2D1.4 provides that if a defendant is
convicted of conspiring to commit an offense involving a
controlled substance, "the offense level shall be the same as
if the object of the conspiracy or attempt had been
completed." Section 2D1.1, in turn, sets forth the offense
levels for the completed offenses of distribution and
possession with intent to distribute based primarily upon the
drug quantity table.

-78-

inherently fact-bound, and "[a] district court's finding of

the amount of drugs involved in an offense will be overturned

on appeal only upon a showing of clear error." United States

v. Tracy, 989 F.2d 1279, 1287 (1st Cir. 1993). "[W]here more

than one reasonable inference may be drawn from undisputed

facts, the court's choice from among supportable alternatives

cannot be clearly erroneous." United States v. McCarthy, 961

F.2d 972, 978 (1st Cir. 1992).

In this case, the court held an evidentiary hearing to

determine the drug quantities attributable to each defendant.

Callahan and Tulowiecki testified regarding the amounts of

narcotics distributed to certain of the defendants. The

court also relied heavily on detailed pre-sentence reports

prepared by the probation officer. See Fed. R. Crim. P.

32(c). Thereafter, the court issued a memorandum opinion

setting forth its factual findings including "how much

controlled substance is attributable to each defendant in

order to establish his base offense level for Guideline

purposes." Order of July 12, 1991 at 2.

B. William Thompson

Thompson first argues that the Sentencing Guidelines do

not apply to him because the principal evidence against him--

the provision of registry checks and cellular phones--

occurred prior to November 1987, when the Sentencing

Guidelines took effect. Thompson waived this claim by

-79-

failing to make it during the sentencing process. See

Figueroa, 976 F.2d at 1462. In any event, the Guidelines

applied to Thompson, because he was a member of an ongoing

conspiracy that continued past the effective date of the

Guidelines and Thompson did not withdraw before the

Guidelines became effective. See United States v. Thomas,

895 F.2d 51, 57 (1st Cir. 1990).

Thompson next contests the calculation of the quantity

of drugs for which he is accountable. Thompson's principal

contributions to the venture did not lie in particular drug

transactions but rather in the provision of services to

Innamorati. Thompson helped Innamorati set up his

communications network and ran license plate registry checks

on prospective customers, and Thompson knew Innamorati was a

large-scale distributor. Innamorati himself was responsible

for the importation and distribution of approximately 16

kilograms of cocaine and 450 pounds of marijuana.

The pre-sentence report concluded that Thompson

purchased small quantities of cocaine for personal use

amounting to approximately 46 grams. Further, Thompson

admitted before the grand jury that he had been aware since

1983 or 1984 that Innamorati was distributing cocaine, and

that he often was present in Innamorati's house when

Innamorati possessed large amounts of cocaine. Based on

these facts, the probation officer (and later the court)

-80-

determined that it was reasonable to conclude that Thompson

could have foreseen that Innamorati was dealing in multiple

kilograms. Recognizing that it was engaged in a "highly

speculative task," the probation officer determined that

Thompson could reasonably have foreseen 3.2 kilograms of

cocaine, based on the cocaine purchased and the cocaine he

personally saw in Innamorati's house.

We think the 3.2 kilogram finding is at the low end of

the range of figures that might reasonably have been chosen.

Thompson knowingly assisted Innamorati's drug ring

operations, well aware that Innamorati was involved in the

importation and distribution of large amounts of cocaine. He

saw large caches of cocaine in Innamorati's home and made

purchases for himself, and the district court treated

Thompson favorably by limiting his accountability to these

amounts. The computation of what Thompson himself saw and

bought is necessarily an estimate but is hardly an

implausible one. We see no error.

Thompson argues that the court wrongly increased his

base offense level under U.S.S.G. 3B1.3, which provides for

a two-level enhancement if "the defendant abused a position

of public or private trust . . . in a manner that

significantly facilitated the commission or concealment of

the offense." The court based this enhancement on the fact

that Thompson had worked as a Massachusetts Registry police

-81-

officer from 1978 until some time around 1985 and used that

position to gain access to the registry computer and provide

license plate checks to Innamorati.

Employment as a registry police officer clearly

qualifies as a "position of public . . . trust" within the

meaning of the Guideline. E.g., United States v. Rehal, 940

F.2d 1, 5 (1st Cir. 1991) (police sergeant). Although we

have found no case law on point, we do not believe it matters

that Thompson was no longer employed with the registry at the

time he provided the information to Innamorati, so long as he

abused the access that his former position afforded him. The

Guideline itself does not limit its application to cases in

which the defendant is employed at the time, and the

underlying policy appears to apply to this case.

If and when others among the public could gain access to

motor vehicle information in the registry is not entirely

clear. But the evidence at trial indicated that Thompson's

prior employment made it easier for Innamorati to do so.

There was police testimony that it was improper for anyone to

perform a check without a valid law enforcement purpose, a

test that Thompson's activities clearly did not meet. Given

these facts, we do not believe that the sentencing judge

committed clear error by concluding that Thompson abused a

position of public trust. See Rehal, 940 F.2d at 5 (applying

-82-

"clearly erroneous" standard of review to abuse-of-trust

adjustment under section 3B1.3).

Finally, Thompson argues that the court erred by failing

to award him a four-level reduction as a "minimal

participant" under section 3B1.2(a). A "minimal" participant

is defined as one who is "plainly among the least culpable of

those involved in the conduct of a group." U.S.S.G. 3B1.2

comment note 1. A "minor" participant"-- defined as one "who

is less culpable than most other participants, but whose role

could not be described as minimal," id. (n.3) -- is entitled

to a two-level reduction under U.S.S.G. 3B1.2(b). The

Guideline also permits the court to award a three-level

decrease to persons whose participation was more than minimal

but less than minor. The four-level "minimal participant"

adjustment was intended to be applied "infrequently"; an

example given is an individual recruited as a courier for a

single transaction in an larger enterprise. Id. note 2.

Here, the court concluded that Thompson was not a "minimal

participant" in light of his substantial assistance to and

close association with Innamorati. At the same time, the

court found that Thompson played a limited role in

Innamorati's overall distribution activities, and was not

shown to have cocaine himself or to have shared in the

profits. The court was reasonable, indeed generous, in

-83-

awarding Thompson a three-level reduction for persons falling

in between the "minimal" and "minor" participant categories.

C. Robert DeMarco Sr.

DeMarco Sr. challenges the court's determination that he

is accountable for 4.25 kilograms of cocaine. This finding

was based on the testimony of Callahan at the sentencing

hearing that he distributed an average of a quarter kilogram

of cocaine per month to DeMarco Sr. from January 1987 through

February 1988. It is unclear whether Callahan was including

in this "average" one or both of two initial one-kilogram

sales to DeMarco Sr. But the district judge resolved that

uncertainty by concluding that one of the kilograms was

included in the average and the other was not. This

conclusion was not clearly erroneous. Indeed, Callahan

testified:

I would say the second full kilo was part of the
average. But conservatively speaking, I would say
you could exclude the first kilo and the average
would still be quarter kilo a month.

Thus, the sum of 4.25 kilograms was derived by totalling the

quarter kilogram sales over a thirteen-month period (which

amounts to 3.25 kilograms), and then adding the additional

one-kilogram sale. Although there were discrepancies in

Callahan's testimony as to the quantities and dates of drug

sales to DeMarco Sr., "the court's choice from among

supportable alternatives cannot be clearly erroneous." See

McCarthy, 961 F.2d at 978.

-84-

DeMarco Sr. also argues that the court abused its

discretion by failing to award him the reductions provided

under section 3B1.2 to "minor" or "minimal" participants.

The district court was justified in concluding that DeMarco

Sr. was a major customer whose monthly purchases of quarter

kilograms of cocaine for more than a year helped keep the

conspiracy in operation. Indeed, as the government points

out, only two of the defendants--Innamorati and Grady--had

more cocaine attributed to them at sentencing than DeMarco

Sr. We find no error in the court's refusal to grant a

downward adjustment.

D. William Letters

The court found that Letters was responsible for 510

grams of cocaine. This was less than a third of the amount

attributed to Letters by the probation officer. Tulowiecki

testified at trial that he delivered quarter, half or full

ounces of cocaine at least weekly and often several times per

week to Letters between January 1987 and February 1988.

Taking an average of one ounce or 28 grams per week over this

fourteen-month period, the probation officer determined that

Letters should be held responsible for approximately 1588

grams. For reasons that are unexplained, the court reduced

this amount to 510 grams. The court's reduction did not have

a corresponding effect on Letters' sentence, however, since

-85-

the Guidelines supply the same base offense level of 26 for

any quantity between 500 grams and two kilograms.

Despite Tulowiecki's testimony, Letters points out that

the chart prepared from Tulowiecki's drug ledger reflected

the sale of only 336.5 grams of cocaine to Letters. But it

was clear from Tulowiecki's testimony at trial and at the

sentencing hearing that the chart was incomplete; it showed

only sales over a limited period of time and for which there

were written records, not all sales. The chart showed sales

to Letters only for the period June 1987 to February 1988,

whereas Tulowiecki testified that deliveries were made to

Letters starting in January 1987. In sum, although the basis

for the court's calculation of 510 grams does not appear from

the record, the evidence supported a determination of at

least that amount.

Letters also challenges the calculation of his criminal

history category. On March 30, 1990, while Letters was

released on bail pending trial in this case, he was arrested

for possession of cocaine with intent to distribute. Letters

was convicted of that offense in April 1991 and was serving a

sentence on that conviction at the time of sentencing in this

case. This new conviction increased Letters' criminal

history by three points pursuant to U.S.S.G. 4A1.1(a),

which directs the district court to "add 3 points for each

prior sentence of imprisonment exceeding one year and one

-86-

month." Combined with other pertinent information, this

increase gave Letters a total of seven criminal points,

placing him in Criminal History Category IV.

Letters now argues that the March 1990 offense should

not have been included in the calculation because under the

Guidelines "prior sentences imposed in related cases" are to

be treated as one sentence in the criminal history

computation. U.S.S.G. 4A1.2(a)(2). Letters contends that

the March 1990 offense was "related" to the conspiracy for

which he was convicted in this case, and therefore should not

have been separately considered in determining his criminal

history. Letters, however, did not make this argument at

sentencing, in response to the calculation of his criminal

history in the Pre-sentence report or at the sentencing

hearing before the district court. The argument was

therefore waived. See Figueroa, 976 F.2d at 1462. Contrary

to Letters' brief, the statutory provision permitting

appellate review of sentencing errors, 18 U.S.C.

3742(e)(1), does not disturb the long-standing rule that

claims must first be made in the district court to preserve

them for review.16

16Even if the issue had not been waived, there is
substantial reason to believe that Letters' March 1990
offense occurred after the end of the Innamorati conspiracy.
The DEA search warrants were executed in February 1988 and by
March 1988 Innamorati was in prison on a state-court
conviction.

-87-

E. James Litterio

Litterio contends that there was insufficient evidence

to support the district court's determination that he is

responsible for 1.7 kilograms of cocaine. The 1.7 kilogram

figure is based on Tulowiecki's testimony that he delivered

small amounts of cocaine to Litterio several times a week

between January 1987 and February 1988 (based on a

conservative estimate of 10 grams per week, the total amount

was fixed at 600 grams); on evidence that Litterio provided

four ounces (112 grams) of cocaine to his brother Mark that

were then sold to undercover agents; and on Tulowiecki's

testimony that soon after the four-ounce deal Litterio

ordered an additional kilogram of cocaine from Innamorati,

although the deal was canceled when it was discovered that

undercover officers might be involved.

Although Litterio argues that he should not be held

responsible for cocaine that he purchased for personal use,

this confuses the standard for criminal liability with that

for sentencing accountability. Purchases by an addict or

casual user for personal use may not automatically make one a

member of a conspiracy to distribute. The situation is quite

different where, as here, the evidence shows that there was a

conspiracy and that a defendant was a member. At that point,

that defendant's purchases for personal use are relevant in

-88-

determining the quantity of drugs that the defendant knew

were distributed by the conspiracy.

F. John Boisoneau

The court held Boisoneau responsible for 316.52 grams of

cocaine and sentenced him to 33 months imprisonment, which

was at the bottom of the applicable range. The calculation

of 316 grams included approximately 250 grams of cocaine that

Boisoneau observed on one occasion while visiting the

Edgewater Hills safehouse. When Boisoneau saw this "hunk" of

cocaine he told Innamorati to put it away because it made him

nervous. Boisoneau argues that in light of his reaction to

the 250 grams of cocaine it was unreasonable for the court to

hold him accountable for that amount at sentencing.

The standard in computing the quantity of drugs is the

amount of cocaine that Boisoneau reasonably should have

foreseen to have been embraced by the conspiracy that he

entered. See O'Campo, 973 F.2d at 1026. The 250 grams of

cocaine that Boisoneau observed in Innamorati's safehouse is

reasonably included in determining the total amount of

cocaine that Boisoneau could have foreseen, regardless of

whether the amount made him nervous. If there were evidence

that Boisoneau effectively withdrew from the conspiracy after

he saw the "hunk" and realized the scope of Innamorati's

operation, this would be a different case, but there is no

evidence of any such withdrawal.

-89-

* * *

In these ten appeals, somewhere between 50 and 100

points were raised by individual defendants, although there

is some overlap. We have addressed those that appeared

substantial and we have considered without discussion a

number of others that were plainly without merit, were raised

in a perfunctory fashion, or both. Because of the number of

claims, the defendants' briefs were reviewed again after the

opinion was prepared to make certain that no claim of error

was overlooked. The judgments are affirmed except that

the judgment of conviction of defendant Grady on Count 4 is

vacated and his case is remanded for resentencing.

-90-